1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOE BELL, JR.,                                        No. C 07-6134 MHP (pr)

        Petitioner,              **ORDER DENYING HABEAS**
**PETITION**

   v.

BEN CURRY, warden,

        Respondent.
_____/

**INTRODUCTION**

     Joe Bell, Jr.,  an inmate at the Correctional Training Facility in Soledad, filed this <u>pro</u>
<u>se</u> action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now before
the court for consideration of the merits of the <u>pro se</u> habeas petition.  For the reasons
discussed below, the petition will be denied.

**BACKGROUND**

     Bell was convicted in Los Angeles County Superior Court of second degree murder
with use of a firearm, and was sentenced in 1993 to 16 years to life in prison.  His habeas
petition does not challenge his conviction but instead challenges a July 28, 2005 decision by
the Board of Parole Hearings ("BPH") that found him not suitable for parole.  The BPH
identified the circumstances of the commitment offense, Bell's prior criminality and failure to
profit from previous attempts to correct his criminality, and his insufficient participation in
beneficial self-help programs as the reasons for finding him unsuitable.

1   Bell sought relief in the California courts.  The Los Angeles County Superior Court
2   denied his petition for writ of habeas corpus in a reasoned decision.  The California Court of
3   Appeal and California Supreme Court summarily denied his petitions for writ of habeas
4   corpus.

5   Bell then filed his federal petition for a writ of habeas corpus.  The court found
6   cognizable his claim that his right to due process was violated because the evidence was
7   insufficient to support the BPH's decision that he was unsuitable for parole.  Respondent
8   filed an answer and Bell filed a traverse.  The parties also filed supplemental briefs after the
9   <u>Hayward</u> <u>en</u> <u>banc</u> opinion was issued.

10                                    **JURISDICTION AND VENUE**
11   This court has subject matter jurisdiction over this habeas action for relief under 28
12   U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged
13   action concerns the execution of the sentence of a prisoner housed at a prison in Monterey
14   County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

15                                             **EXHAUSTION**
16   Prisoners in state custody who wish to challenge collaterally in federal habeas
17   proceedings either the fact or length of their confinement are required first to exhaust state
18   judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
19   highest state court available with a fair opportunity to rule on the merits of each and every
20   claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c).  The parties do not
21   dispute that state court remedies were exhausted for the claim asserted in the petition.

22                                      **STANDARD OF REVIEW**
23   This court may entertain a petition for writ of habeas corpus "in behalf of a person in
24   custody pursuant to the judgment of a State court only on the ground that he is in custody in
25   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).
26   The petition may not be granted with respect to any claim that was adjudicated on the merits
27   in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that
28   was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.      State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402©.  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A

parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness."  In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in source).  Where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety."  Id. at 1191 (emphasis in source).

4

B.      Federal Habeas Relief On Parole Denial Claims

          The U. S. Constitution's Due Process Clause does not itself provide state prisoners with a federal right to release on parole.  Hayward v. Marshall, 603 F.3d 546, 562 (9th Cir. 2010) (en banc).  The substantive law of a state might create a right to release on parole, however.  See id. at 555, 559.  Although Hayward purported not to reach the question whether a California's substantive law created a federally protected liberty interest, see id. at 562, later cases from the Ninth Circuit have said or assumed it does.  See Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter of federal law. . . .  By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause." );  Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In Hayward, we held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA"); id. ("we must examine the nature and scope of the federally enforceable liberty interest created by California's 'some evidence' requirement"); see also Pirtle v. California Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release on parole.'  McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir 2002).  That liberty interest encompasses the state-created requirement that a parole decision must be supported by 'some evidence' of current dangerousness. Hayward [603 F.3d at 562-63.]")   Hayward's application and these later cases make it clear that in the Ninth Circuit there is federal habeas relief available under § 2254 for California prisoners denied parole without sufficient evidence, although it now appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

          A federal district court reviewing a California parole decision "must determine 'whether the California judicial decision approving the governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the

evidence.'" <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That requirement was summarized in <u>Hayward</u> as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. [¶]  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

<u>Hayward</u>, 603 F.3d at 562 (footnotes omitted) (quoting <u>Lawrence</u>, 44 Cal. 4th. at 1210, 1213-14); <u>see also</u> <u>Cooke</u>, 606 F.3d at 1216 (describing California's "some evidence" requirement).

When a federal court considers a habeas case directed to a parole decision, the "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. § 2254(d)(2) for whether the decision was "based on an unreasonable determination of the facts in light of the evidence."  <u>Cooke</u>, 606 F.3d at 1214 (citing <u>Hayward</u>, 603 F.3d at 563).

C.    <u>Bell's Case</u>

    1.    <u>His Circumstances</u>

<u>Commitment offense</u>:  The facts surrounding the murder are, at best, confusing.  Because one of the main reasons for the finding of parole unsuitability was the sense that Bell had no insight into it, the "official" version of the crime will be described and then Bell's occasionally contradictory explanations will be described in this section.  The murder was described in the October 2001 board report, which the BPH commissioner read into the record.

> On February 17, 1992, Joe and Mona Bell were engaged in a heated argument with the victim and decedent Chloe Rogers over the nonpayment of a $28 debt reportedly owed to one or both of the defendants by Joe Bell's daughter Sybil Bell.  Chloe Rogers reportedly was a cousin of Sybil Bell by marriage and also was reportedly visiting Sybil Bell's household when the pair arrived to confront one or both young women regarding the whereabouts of the outstanding debt.  When the suspects arrived at approximately 4:40 a.m. they were both armed with shotguns.  Further information provided to police officers from Sybil Bell indicate that at some point during the

heated argument the victim and decedent in this case, Rogers, made an attempt to leave to room when Mona Bell suddenly opened fire upon Rogers. The victim was struck by several shotgun pellets to the right side of her chest. An ambulance was called and ambulance hospital personnel tried unsuccessfully to revive the victim. Approximately one hour after being shot, the victim was pronounced dead. The cause of death was listed as severe hypoglycemic shock resulting from massive blood loss. On February 19, 1992, two days after the murder, Mona Bell surrendered to police authorities.

Resp. Exh. C at Exh. A, 7/28/07 BPH hearing reporter's transcript ("RT") 12-13. Bell surrendered when his wife did, two days after the shooting.

Although he did not dispute that both he and his wife were armed with loaded shotguns when they went to his daughter's house at 4:40 a.m., Bell was unclear on why he went there. At one point he said he had been asleep and that his daughter or niece called his house and said there were armed men at his daughter's home, RT 14, 17. He thought maybe there were gang members there, although he didn't know why they would be, and when he arrived there no gang members were present. See RT 17-18, 36. He also said his daughter affiliated with gang members although he didn't mean she was a gang member, RT 18. He said his daughter was known to use drugs, RT 18, or maybe she didn't, RT 19. His daughter was involved in some illicit activity apparently relating to check-cashing. RT 19. At one point, he said he went over there to protect his daughter because he "thought that there was something going on," RT 15, while elsewhere he said it was "not to protect them so much [as] to see what it was all about," RT 25. At trial, his daughter had testified he had never gone to her rescue, which was incorrect, in his view. RT 27. When he got there, his daughter was "drinking or she was high or whatever," RT 15, and her testimony that he pushed her on the floor was false, RT 15. He also said that (along with the loaded shotgun) he brought cold medicine for the daughter of Chloe, the victim, because she had earlier asked him to bring cold medicine. RT 16. He denied that there was a debt dispute. He said that his daughter had owed him some money but he didn't need it that day as he had just received $25,000. RT 14. She didn't have any means of paying him back so the statement that there was a debt dispute was "not true." RT 15. The $28 figure was the amount of money he had given his daughter that evening or that morning, even though she apparently testified the argument was over the $28. RT 23.

7

The evidence was in conflict about what took place once Bell and his wife arrived at the house.  Although it was understood he was not the shooter, there was conflicting information as to whether he was present or in another room at the time his wife pulled the trigger and shot the victim.  He said that he offered the cold medicine to Chloe, that his wife had the cold medicine in her hand and then he heard a gun go off.  RT 20.   He didn't know why he did nothing to try to help the victim after she was shot, RT 20-21, although elsewhere he said he didn't call an ambulance because he and his wife were startled, RT 24, and elsewhere said he knew that his "daughter was there and if there was anything that terrible that she would call the ambulance or whatever," RT 36.  He didn't know why the gun discharged, but was sure it wasn't intentional.  RT 22, 33.   At trial, his daughter testified that Bell's wife shot the victim during an argument.  RT 39.  Another witness said she was in the back bedroom and heard arguing; "'[s]he looked out of the bedroom door and saw Joe Bell pulling Sybil's [his daughter's] hair and saw a pair of woman's hands holding a rifle.  She heard a voice which she recognized as [Bell's wife's] saying, shut up, bitch. Sybil, tell the bitch if she doesn't give me my money, I'll kill the bitch. She heard one shotgun.'"  RT 39.  Bell's response was that, as far as he knew, no one else lived in the house and that this wasn't the way it happened.  RT 40.  When his daughter testified at trial, he wondered "if she'd been paid or what."  RT 84.

Bell also offered no reasonable explanation of why he and his wife went into hiding at a hotel if the shooting had, in fact, been an accident.  See RT 24.  And Bell was unable to explain why he and his wife had never discussed the shooting after it took place, especially if it had, in fact, been an accident.   He said "I've never asked her because I know that it wasn't intentionally."  RT 21, 22.  When asked how he knew it wasn't intentional, Bell said it was because his wife wasn't angry with the victim, there was no reason to shoot, and his wife and the victim hadn't even been discussing anything.  RT 21.22.  As he tried to explain the sequence of events, he so frequently digressed to other topics that he seemed very evasive.  See, e.g., RT 30-31.

Bell's shifting story continued through the time he filed this action.  In his petition, he

called it a "self-defense 2nd degree murder," Petition, p. 5, which was not consistent with either the board report or Bell's version at the parole hearing. Not once at the hearing did he suggest there was any self-defense aspect to the shooting, and his story of an accidental shooting during a non-argument is even less believable when he now characterizes the killing as one done in self-defense.

Prior Criminality: Bell had no juvenile record. As an adult, he had nine convictions before the commitment offense that was committed when he was about 49 years old. See RT 40-48. Bell had been arrested and convicted of disturbing the peace in 1961. He had been arrested on outstanding traffic and/or unpaid parking ticket warrants and convicted on same in 1961, 1963, and 1966. He was arrested and convicted on Vehicle Code offenses in 1968 and 1970. Bell said he had suffered one DUI conviction, and the District Attorney stated that he had suffered three DUI convictions. He had been convicted of theft in 1964. He had been convicted of conspiracy to commit bookmaking in 1965. He was convicted of lewd conduct in 1971, which he said was for picking up a prostitute. He was convicted of grand theft in 1988. These convictions resulted in fines, periods of incarceration, as well as some probationary periods.

Post-Incarceration Behavior And Activities: Bell had received only one CDC-115 during his 12 years in prison. He had received a CDC-115 disciplinary write-up in 1997 for failing to return a putty knife at his workplace. He had received no CDC-128s, which are counseling memos written for lesser transgressions of prison rules.

Bell had owned his own shoe business before he was incarcerated and had a high school diploma. While in prison, he obtained certificates in the print shop vocation in the 1990s and in the office services vocation in 1995. He also had learned ASL sign language. Bell was not currently working at a job in prison, although long ago he had worked as a tutor at Wasco State Prison.

Bell attended Alcoholics Anonymous in 2004 and 2005 consistently.

Bell also had done many self-help classes and programming. Among others since his last hearing, he had taken anger management classes in 2004 and 2005, taken courses in

1   fatherhood and family effectiveness in 2005, and taken the Impact course in 2003.  He also

2   had started the Cage Your Rage class but was not eligible to remain in it because he was not

3   in the mental health care system.

4          Psychological Evaluation: The most recent psychological evaluation for Bell was

5   done on January 3, 2002, and was favorable.  The psychologist thought the inmate's "current

6   level of insight and judgment in general and specifically regarding his commitment offense is

7   very good and supports a positive prediction of successful adaptation to community living."

8   See Resp. Exh. A at Exh. B,1/3/02 mental health evaluation at 4.   That assessment, however,

9   appears to have been based on Bell's description of the crime, which was that the victim was

10  killed when his wife accidentally discharged a shotgun during a domestic argument.  Id.  The

11  psychologist opined that "if released to the community, his violence potential is considered to

12  be no more than that of the average citizen in the community in an unstructured

13  environment."  Id. at 6.

14         Parole Plans: Bell had parole plans.  He planned to live with a woman he had known

15  for several decades and intended to marry.  He also apparently had a job offer.

16              2.    BPH's Decision And State Court Review

17         The BPH determined that Bell was not suitable for parole and "would pose an

18  unreasonable risk of danger to society or a threat to public safety if released from prison."

19  RT 96.  The BPH relied on the commitment offense, which was "carried out in an especially

20  cruel and callous manner," and in a "dispassionate and calculated manner," in that the victim

21  was shot in the chest with a shotgun and was shot for a trivial motive, i.e., a dispute about a

22  $28 debt.  RT 96.  The BPH also relied on Bell's prior criminality and failure to profit from

23  society's attempts to correct such criminality, which involved probation and county jail time.

24  RT 100.  And the BPH determined that Bell had "not sufficiently participated in beneficial

25  self-help programs in that it appears that you have not come to terms with the underlying

26  cause of the offense given some of the statements that you have made today."  RT 100.  The

27  BPH commended Bell for having received only one disciplinary write-up during his entire

28  incarceration and for his extensive participation in a variety of self-help programs, but

1   concluded that these positive aspects of his case did not outweigh the factors of unsuitability.

2   RT 103.

3         A BPH commissioner explained why they thought that Bell needed further therapy to

4   come to terms with the underlying causes of the offense.

5           [Y]ou have not been fully forthright with us regarding the reason for the commitment
        offense and the reason why you and your wife were there. And this is based on

6           statements that you've made which are fully contradictory to information in the
        probation officer's report, information in the police report, as well as witness

7           statements. This Panel does not feel – I don't know whether – We don't know whether
        you're in denial or whether you were under the influence of something at the time of

8           the offense or whether there's a specific reason why you would not recall specific
        factors relative to the offense. But all indications in the file would indicate that there

9           was yelling, there was screaming, there was an argument. You grabbed your daughter
        by the hair and shortly thereafter your wife shot the victim in this case. Your

10          statements to us today are that there was no anger, there was no argument, there was
        no shouting. And you even referred to this as an accident. But yet, if you really

11          believe that it was an accident, then it would not be logical . . . that you would get in
        your van, leave, be gone for two days and then turn yourself [in to] law enforcement if

12          in reality you felt that this was an accident. That doesn't make sense.

13  RT 102-103. The BPH commissioner also stated that the idea that the husband and wife did

14  not speak about the shooting after they left the house was "very difficult to believe." RT 104.

15  The BPH requested that, before the next hearing, there be a clinical evaluation specifically to

16  determine Bell's violence potential in the community, and "to determine the extent to which

17  [Bell has] come to terms with the underlying cause of the offense." RT 105.

18        The Los Angeles County Superior Court determined that the finding of parole

19  unsuitability was supported by some evidence. Resp. Exh. E at Exh. B. The court found that

20  there was some evidence in the record to support the BPH's conclusion that the commitment

21  offense was carried out in a calculated manner in that both Bell and his wife were armed with

22  shotguns when they went to their daughter's house and the victim was shot in an argument

23  over a small debt. Id. at 1. The BPH's determination that Bell was not forthright in his

24  version of the murder was "supported by evidence in the record. Petitioner's insistence that

25  the murder was accidental and no argument ensured prior to the shooting is inconsistent with

26  the probation officer's report, information in the police as well as witness statements.

27  Prisoner's untruthfulness at a parole hearing with regard to the circumstances of the

28  commitment offense reflects the prisoner's present mental state and attitude toward the

1   offenses.  This is a relevant factor indicating the prisoner's present danger to society if

2   released on parole. (Title 15 California Code of Regulations, section 2402, subdivision (b).)"

3   Resp. Exh. E at Exh. B at 2.

4           3.       Analysis Of Habeas Claim

5           As the last reasoned decision from a state court, the Los Angeles County Superior

6   Court's decision is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501

7   U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

8           The murder fit two of the regulation's criteria for determining that a murder was

9   committed in an especially heinous, atrocious or cruel manner.  There was evidence that it

10  was "carried out in a dispassionate and calculated manner," § 2402(c)(1)((B), in that Bell and

11  his wife went to the household armed with shotguns and the victim was shot during an

12  argument with them about a very small debt, although Bell did not do the actual shooting.

13  This killing also was for a very "trivial" motive, § 2402(c)(1)(E), i.e., the dispute over a $28

14  debt.  Significantly, the murder was not the only reason for the unsuitability finding.

15          The BPH was concerned that this inmate had not learned anything about the murder

16  because he was not forthright in his discussion of it.   Bell was well into his sentence – about

17  12 years into the 16 to life sentence – but he had not yet served the minimum number of

18  years (excluding time credits) at the time of this BPH hearing, which was his second parole

19  hearing.  See generally Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007) (due process was

20  not violated by the use of the commitment offense and pre-offense criminality to deny parole

21  for a prisoner 16 years into his 17-to-life sentence).  A review of the record leaves the reader

22  with a strong sense that Bell's explanation for the events of that night was not credible, and

23  that he was hiding or unable to remember something.  Since he did not claim an inability to

24  remember, the BPH reasonably could see his lack of candor as indicative of a lack of insight

25  into the crime and causative factors.  That, in turn, suggests that there is much rehabilitation

26  remaining to occur for this prisoner.  The failure to understand the causative factors and gain

27  insight about the crime would be a greater concern for Bell than for many other prisoners

28  because he had numerous previous encounters with the criminal justice system and

1   apparently had not profited from those either.  With his record of eight prior convictions and

2   attendant punishments, plus the current conviction as to which Bell demonstrated so little

3   insight, the BPH may have been concerned that, if released, the inmate would return no

4   better than when he arrived in terms of avoiding criminality, notwithstanding his

5   participation in rehabilitative programming in prison.

6          The state court explained the nexus between the historic facts and the current

7   dangerousness evaluation: his untruthfulness at the hearing reflected his present mental state

8   and attitude toward the offense.  See Resp. Exh. E at Exh. B at 2.  The information available

9   reasonably could be viewed to indicate "that the implications regarding the prisoner's

10  dangerousness that derive from his . . . commission of the commitment offense remain

11  probative to the statutory determination of a continuing threat to public safety."  Lawrence,

12  44 Cal. 4th at 1214.  Bell's 12 years of incarceration, his self-help programming, his

13  vocational achievements and his positive disciplinary record count in his favor, but do not

14  overcome the evidence that showed him to be not suitable for parole.  Cf. Shaputis, 44 Cal.

15  4th at 1259-60 (upholding unsuitability determination for prisoner who, despite favorable

16  programming and prison behavior, still had not gained insight into his domestic violence and

17  murder of his wife); Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007) (due process was not

18  violated by the use of the commitment offense and pre-offense criminality to deny parole for

19  a prisoner 16 years into his 17-to-life sentence).  There was some evidence to support the

20  BPH's findings on the commitment offense, prior criminality and failure to profit from earlier

21  attempts to correct his criminality, and his need for further self-help programming or therapy

22  to understand the causative factors for the crime.  These circumstances also provided reliable,

23  probative evidence of Bell' current dangerousness.   The state court's rejection of Bell's

24  petition was not an unreasonable application of California's "some evidence" requirement

25  and was not based on an unreasonable determination of the facts in light of the evidence.

26   Bell therefore is not entitled to federal habeas relief.

27          As in many parole cases, the petitioner here has not disputed the evidence behind the

28  BPH commissioners' statements during the review of the record – such as the number and

nature of the CDC-115s and the statements in the probation officer's report – and instead disagrees with the inferences the BPH drew based on that evidence.  It thus was possible to decide the merits of the petition in this case without having some of the original documents in the record, such as the probation officer's report and the life prisoner evaluation report.  In future cases, however, the parties and respondent's counsel must endeavor to put a more complete record before this court.  Instead of having to rely on a BPH commissioner's recitation of what various documents say, it is preferable to have the record include those actual documents, such as the psychological evaluation,  the life prisoner evaluation report (with its list of the disciplinary offenses), and a probation officer's report or state appellate court opinion describing the commitment offense.

D.      Certificate Of Appealability

A certificate of appealability will not issue. See 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Jurists of reason would not find debatable or wrong that the decision that the state court reasonably applied California's "some evidence" requirement in upholding the denial of parole, and reasonably determined the facts in light of the evidence presented.  See Hayward, 603 F.3d at 562-63.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 12, 2010

_____
Marilyn Hall Patel
United States District Judge

1

## NOTES

2

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the
commitment offense, i.e., whether the prisoner committed the offense in "an especially
heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the
prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual
offense, the prisoner has a lengthy history of severe mental problems related to the offense;
and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances
tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social
history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered
from battered woman's syndrome, lack of criminal history, the present age reduces the
probability of recidivism, the prisoner has made realistic plans for release or developed
marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28